**F I L E D**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**November 4, 2005**

**TENTH CIRCUIT**

---

GINA BAUER and SUZANNE
STOLZ,

      Plaintiffs - Appellants,

v.

MUSCULAR DYSTROPHY
ASSOCIATION, INC.,

      Defendant - Appellee.

No. 03-3197

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 03-1133-WEB)**

---

David P. Calvert, P.A., Wichita, Kansas, for Plaintiffs - Appellants.

Jill A. Morris (Robert A. Kaiser with her on the brief), Armstrong Teasdale LLP, St. Louis, Missouri, for Defendant - Appellee.

---

Before **McCONNELL, HOLLOWAY** and **TYMKOVICH**, Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

---

    Plaintiffs Gina Bauer and Suzanne Stolz sued the Defendant Muscular

Dystrophy Association (MDA), claiming that MDA unlawfully discriminated against

them in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101

*et seq.*, and the Kansas Act Against Discrimination, Kan. Stat. Ann. §§ 44-1001 *et seq*. The Plaintiffs, both of whom have disabilities due to muscular dystrophy, allege that they were denied the opportunity to serve as volunteer camp counselors at a one-week summer camp in Kansas, run by MDA for the benefit of children with muscular dystrophy, because of an MDA policy requiring all volunteers to be able to "lift and care for a camper." After a hearing on Plaintiffs' motion for a preliminary injunction, the parties agreed, pursuant to Fed. R. Civ. P. 65(a), that no further evidence was needed and that the court could issue a final ruling on the merits. The district court entered judgment for Defendant MDA on all counts, *Bauer v. Muscular Dystrophy Association, Inc.*, 268 F.Supp. 2d 1281 (D.Kan. 2003), and Plaintiffs now appeal solely under the ADA.

## I. Background

The following overview of the facts from which this litigation arises is condensed from the opinion of the district court. The MDA is the leading not-for-profit national health organization dedicated to finding the causes of, and cures and treatments for, over forty neuromuscular diseases. *Bauer*, 268 F.Supp. 2d at 1283. One of its functions is to sponsor summer camps to provide recreational opportunities for young people from age 6 to age 21 who have neuromuscular diseases. MDA camps serve approximately 4,200 campers each year at approximately 90 locations throughout the nation. Each camp session is

sponsored by a different local or regional MDA district. Local chapters are not independently operated, however, but are subject to the supervision of the national office, which sets policies for chapters nationwide.

The Wichita District (also referred to as the Ark Valley Chapter) of the MDA sponsors a one week summer camp each year at Camp Chihowa near Perry, Kansas. The camp is not owned by the MDA but rather is leased for the one week session. Camp Chihowa is located on 35 acres. It includes a lake for fishing and boating and 15 wooded acres. Other recreational facilities include a baseball diamond, basketball and volleyball courts, and a swimming pool. Lodging available at the camp includes two lodges and four cabins. Total capacity of the camp is about 180 persons. The main lodge contains a dining room where meals are served to campers and volunteer workers and a meeting room that accommodates up to 250 people. All of the facilities at the camp are fully handicap-accessible.

MDA's summer camp program aims to provide a safe week of recreation for children with muscular dystrophy. Attending the camp permits children with neuromuscular diseases to do things they might not ordinarily get to do, such as socializing with other children who face similar challenges and taking part in various recreational activities with their fellow campers. To be eligible to attend as a camper, individuals must be between the ages of 6-21, must have a

neuromuscular disease that comes within the MDA's purview, and must be registered with the local chapter. 268 F.Supp.2d at 1283-84.

MDA classifies individuals in attendance at MDA summer camps primarily into three groups: young campers, adult volunteer counselors, and MDA paid staff. MDA's paid staff includes the Camp Director and a few others, such as kitchen staff or cooks. MDA also arranges for a volunteer medical staff to be at the camp.

Plaintiffs Bauer and Stolz both attended the Wichita MDA Camp Chihowa as campers from 1981 through 1994. MDA's former Wichita Camp Director allowed the Plaintiffs to serve as volunteer counselors after 1994. MDA solicits volunteer counselors to assist with its summer camp programs. MDA policy requires that volunteer counselors be at least 16 years of age and "of sufficient size and strength to assist with the needs of campers." MDA requires that volunteers be able "to lift and care for campers." MDA has had such a policy for at least 12 years, although apparently the staff running the Wichita camp in previous years were unaware of the policy. *Id*. at 1284.

It is uncontested that Ms. Bauer and Ms. Stolz are persons with disabilities as defined by the ADA. Ms. Bauer has muscular dystrophy and uses a power wheelchair. She is substantially limited in the major life activity of walking. *See* 42 U.S.C. § 12102(2) ("disability" under the ADA includes a physical impairment

-4-

that substantially limits one or more major life activities). She is a substitute teacher. Ms. Stolz has muscular dystrophy and sometimes uses a power wheelchair. She is substantially limited in the major life activity of walking. She is a teacher who lives in California. Neither Ms. Bauer nor Ms. Stolz is able to physically lift or care for campers. Apparently the former management of the camp did not realize that Plaintiffs' participation as volunteer counselors violated the policy requiring all volunteer counselors to be able to lift and care for campers. In any event, between 1995 and 2000, Plaintiffs attended Camp Chihowa as volunteer counselors and performed the supervisory or planning duties of a Unit Leader and/or Senior Counselor. Ms. Stolz also acted as Sports Director during one session.

In 2001, Kim Dinell became the Wichita District Camp Director. She relied heavily on Gina Bauer for assistance in organizing and planning the camp that year. In 2002, Ms. Bauer and Ms. Stolz acted as Newspaper/Yearbook Co-Directors at the camp.

In September of 2002, Kim Dinell told Ms. Bauer that she could not be a volunteer counselor at the camp in 2003, due to the MDA's policy requiring volunteers to be able to lift and care for campers. For 2003, MDA added a question to its volunteer application form asking whether the applicant is able to lift and care for a camper. Neither Ms. Bauer nor Ms. Stolz actually submitted an

application to be a counselor at the 2003 session of camp.  The district court found that MDA had advised the Plaintiffs that they would not have been considered for the position of volunteer counselor even if they submitted their applications because they did not meet the requirement of being able to lift and care for a camper.

## II.  Procedural History

Ms. Bauer and Ms. Stolz filed suit in Kansas state court, alleging that MDA's application of the requirement that volunteer counselors be able to lift and care for campers denied them the opportunity to participate as volunteer counselors and was in violation of the ADA and the Kansas Act Against Discrimination.  In particular, Plaintiffs alleged that Camp Chihowa was a place of public accommodation operated by MDA, as defined under Title III of the ADA, 42 U.S.C. § 12181, as well as under a corresponding section of the state statute, Kan. Stat. Ann. § 44-1002.  They further alleged that by requiring that volunteer counselors be able to lift and care for campers, MDA had imposed eligibility criteria which would screen out or tend to screen out individuals with disabilities from fully enjoying the goods, services, facilities, privileges, advantages or accommodations of Camp Chihowa, and that MDA failed to make reasonable accommodations or take other such steps as would be necessary to allow Ms. Bauer and Ms. Stolz full enjoyment of Camp Chihowa, in violation of

42 U.S.C. § 12182.

Pursuant to 28 U.S.C. §§ 1441 and 1446, the case was removed to the United States District Court for the District of Kansas by MDA, invoking federal question jurisdiction under 28 U.S.C. § 1331. The district court held a hearing on Plaintiffs' motion for a preliminary injunction. At the conclusion of the hearing, the parties agreed, pursuant to Fed. R. Civ. P. 65(a), that no further evidence was needed and that the court could issue a final ruling on the merits.

Thereafter, the district court entered a final decision and judgment for the Defendant. The court held that as adult volunteer counselors at a summer camp for children, Plaintiffs were not covered under Title III of the ADA. *Bauer*, 268 F.Supp.2d at 1293. The court further held that even if Plaintiffs were covered under the Act, MDA's application of its eligibility criteria did not amount to unlawful discrimination because the criteria were necessary to fulfill the primary purpose of the camp and to ensure its safe operation, and that Plaintiffs had failed to identify any reasonable modification of those criteria that would have allowed them to perform the essential functions that were required of them. *Id*. at 1293-94. The court noted that neither side had argued that the public accommodation provisions of the state statute differed in any significant respect from Title III of the ADA, and it therefore ruled likewise in favor of MDA on Plaintiffs' state law claims. *Id*. at 1295 n.5.

-7-

Plaintiffs now appeal, solely under Title III of the ADA. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

### III. Discussion

In reviewing the district court's judgment, we are "bound by the District Court's factual findings in the absence of clear error." *Ballard v. Independent School District No. 4 of Bryan County*, 320 F.3d 1119, 1121 (10th Cir. 2003). This court reviews questions of law *de novo*. *Id.*

This case is before us solely under Article III of the Americans with Disabilities Act. As the district court noted after hearing the evidence:

> The section of the Americans with Disabilities Act under which this lawsuit is brought deals with ensuring that persons with disabilities have equal access to public accommodations. The claim does not involve the section of the ADA we hear about most often, which is the provision barring discrimination against persons with disabilities in employment. The plaintiffs probably cannot rely on the employment section in this case because they are volunteers, and this is not a question of them being denied a paying job or an opportunity to earn a living.

Tr. of Temporary Injunction Hearing Vol. III, Aplee. Supp. App. Vol. I at 279.

There are two main issues raised here: (1) Whether the MDA eligibility criteria for volunteer counselors amounted to unlawful discrimination under the ADA, and, (2) Whether Title III of the ADA applies to adult volunteer counselors at a camp for children. Because we are persuaded that issue (1) should be resolved by holding the criteria for volunteer counselors are not discriminatory,

-8-

we need not decide issue (2) as to whether Title III of the ADA applies to adult volunteer counselors at a camp for children, but instead we will assume, arguendo, that it does.

The nondiscriminatory character of the challenged criteria for volunteer camp counselors is dispositive. First, the court found that the purpose of MDA's summer camp program is to provide a safe and fun week of recreation for children who are between the ages of 6-21, have a neuromuscular disease that comes within the MDA's purview, and who are registered with the local chapter of the organization. *Bauer*, 268 F.Supp. 2d at 1283-84, 1288. A secondary purpose is to provide a brief respite from their care responsibilities for parents of children who attend the camps. *Id*. at 1288. The court found that volunteer assistance is "vitally important" to the MDA and allows MDA to continue operating the camps. *Id*. However, the camps are not operated for the purpose of providing benefits, privileges, or advantages to the volunteers. *Id*.

The district court further found that the position of volunteer counselor was created for the primary purpose of providing physical assistance and supervision to campers. *Id*. at 1293-94. The court found that the duties of volunteer counselors include regularly manually lifting and transferring campers to and from wheelchairs, beds, showers and toilets, and assisting them with their normal daily activities. *Id*. at 1285. Also, volunteer counselors regularly accompany

-9-

campers throughout the camp, push wheelchairs and monitor and assist campers in whatever needs arise, and help campers participate in recreational activities they might not ordinarily get to do, such as swimming and horseback riding. *Id.* Some campers bring vitally necessary, durable medical equipment to camp, such as breathing machines, lung vibrators, wheelchairs, charging station machines and generators. *Id.* Another significant function of volunteer counselors is aiding campers with the safe and proper use of such equipment. *Id.* Counselors may be expected to help campers with packing and unpacking items and with certain cleaning chores. *Id.*

Finally, volunteer counselors are also expected to help evacuate campers in the event of a medical emergency. *Id.* In the past, there have been tornado warnings, blackouts and flooding that required volunteer counselors to evacuate campers and to assist them in taking cover and in meeting their medical needs without electricity. *Id.* There have also been medical emergencies at Camp Chihowa in the past that required the physical intervention of volunteer counselors. *Id.* Such emergencies are infrequent, but they can and do occur. The district court found that emergencies are a reasonably foreseeable occurrence at the camp. *Id.*

The district court found that MDA has developed its policies and risk assessment plans at the national level. *Id.* Marianne Clark is the Associate

Director of Health Care Services for MDA and the national director for MDA's summer camp program. *Id.* Ms. Clark testified concerning considerations that went into MDA's policies on selection of volunteer counselors. *Id.* MDA initially relied upon standards promulgated by the American Camping Association (ACA), as well as assistance from risk management advisors, insurance personnel, and legal counsel. *Id.* Ms. Clark is a member of the ACA and has attended several of its conferences. *Id.* The district court found that MDA is not an expert in the area of camps, and so it relies upon ACA standards as a benchmark of appropriate conduct. *Id.* A publication of the ACA providing a sample of the essential functions of a camp counselor states in part that a counselor should "be able to assist campers in emergency (fire, injury, etc.); . . . and possess strength and endurance required to maintain constant supervision of campers." *Id.* The district court found that being able to assist in lifting campers – on a regular basis and in the rare event of an emergency – is an essential function of the position of volunteer counselor. *Id.* at 1293.

The district court further found that in the past the Wichita MDA Camp had significantly more volunteer counselors than were necessary to operate the camp safely and efficiently. *Id.* at 1287. At the 2002 Wichita session at Camp Chihowa, there were approximately 40 campers and 70 volunteers. *Id.* Nancy Inwood, who is District Director for the Wichita District MDA and whose duties

include supervising the Camp Director, testified that she attended the Wichita session at Camp Chihowa in 2002. *Id*. She concluded there were too many volunteers at the camp and that many volunteers were simply "milling around" without any particular duties. *Id*. She believed the MDA should re-orient the focus of the camp on the campers and should use its resources more efficiently by reducing the number of volunteers and by having them perform multiple duties. *Id*. The district court found that one result of having had a disproportionate number of volunteers in the past at the Wichita MDA camp was to divert attention and resources away from the campers and to the volunteers. *Id*. at 1288.

According to Ms. Inwood's testimony, while she was at the camp in 2002, it appeared to her that the Plaintiffs' duties on the newspaper and yearbook took little time and that the Plaintiffs spent a great deal of time doing other things. *Id*. at 1287. She saw Ms. Bauer swimming while the campers were taking a break and noticed that she required a lot of assistance, including two or three people to help her in and out of the pool and one to hold her while swimming. *Id*. Julie Slack, a Health Care Services Coordinator for MDA and the assistant camp director for the Wichita MDA Camp (as well as camp director for the Shawnee Mission MDA Camp), echoed this sentiment. *Id*. She observed that Ms. Bauer worked on the yearbook for an hour or two a day and then spent the rest of the time "hanging out." *Id.* Ms. Inwood testified that the Wichita MDA received

complaints from at least two campers who said they did not intend to return if the Plaintiffs were allowed to return because they felt the camp had become too "volunteer-oriented" rather than "camper-oriented." *Id.*

The district court found that MDA has a compelling interest in selecting appropriate volunteers who can ensure the safety of the campers attending the MDA summer camp. *Id.* at 1293. It further found that the requirement that a volunteer counselor be able to lift and care for a camper was necessary for the safe operation of the camp and also necessary to provide the privileges of the camp to its intended beneficiaries – *i.e.*, campers and their parents. *Id.* at 1294. Also, the court found that requiring MDA to alter this standard would require MDA to incur significant costs, would increase risks to its campers, increase risk of liability, and shift resources away from the intended beneficiaries of the camp to the counselors who are there for the purpose of assisting campers. *Id.*

Finally, the district court found that MDA provides opportunities for individuals to participate in its activities outside of working as paid staff or serving as volunteer counselors at its summer camps. MDA allows adult volunteers with expertise in a particular area to apply and participate at a summer camp as "One Day Special Activity Guests." MDA also provides opportunities for adults to participate outside of the camp program, such as through support groups, educational seminars, fund-raisers and district committees. The Wichita

MDA offered Ms. Bauer the opportunity to participate in the pre-planning stages of the 2003 summer camp session, but she indicated she would not help if she could not be a counselor at the camp.

Plaintiffs do not contend that any of the district court's factual findings were clearly erroneous. In light of the evidence presented and findings of fact discussed above, we must conclude that the district court did not err in its ultimate finding that MDA's eligibility criteria are necessary for the safe operation of the camp and are also necessary to provide the privileges and advantages of the camp to the intended beneficiaries of the camp. The district court likewise did not err in concluding that there was no reasonable modification that MDA could make to mitigate the risk posed by volunteer counselors who are not able to lift and care for campers as the MDA requires.

Plaintiffs' requested modification is essentially that they be allowed to return to Camp Chihowa and continue in the same capacity that they did in earlier years. Plaintiffs contend that MDA failed to conduct any individualized assessment concerning the nature, duration and severity of the alleged risk they posed, the probability that a potential injury would actually occur, and whether reasonable modification would mitigate that risk. As a result, Plaintiffs argue, MDA cannot show that Plaintiffs posed a "direct threat" to campers or other persons at the Camp Chihowa site. *See* 28 C.F.R. § 36.208; *see also Anderson v.*

*Little League Baseball*, 794 F.Supp. 342 (D.Ariz. 1992) (holding that Little League Baseball failed to conduct an individualized assessment of the threat allegedly posed before adopting a policy barring coaches in wheelchairs from being in the coach's box on playing field). Plaintiffs further contend that absent such an individual assessment, any conclusion by the district court with respect to the alleged risk of allowing Plaintiffs to serve as volunteer counselors was purely speculative.

In spite of Plaintiffs' contentions, however, the evidence and factual findings of the district court do show that MDA made assessments, both when it initially promulgated the "lift and care for a camper" rule, and in Ms. Inwood's 2002 visit to the camp site. The "lift and care for campers" rule was based on objective criteria promulgated by the ACA, as well as assistance from risk management advisors, insurance personnel, and legal counsel. The district court determined that emergencies were a reasonably foreseeable occurrence at the camp, and that being able to lift and care for campers was an essential function for volunteer counselors, particularly in the event of an emergency.

The conclusion of the assessments made was that MDA needed to reduce the ratio of volunteer counselors to campers, as well as to ensure that volunteer counselors could meet all the requirements of their position, including the essential function of lifting and caring for campers. The assessment further

concluded that MDA could not accommodate volunteer counselors who were unable to perform this essential function. MDA notified Ms. Bauer and Ms. Stolz that they were not eligible to return to the 2003 session of camp as volunteer counselors, and they were invited to participate in the camp program in other ways. Plaintiffs brought this suit instead.

While this is not a case brought under Title I of the ADA, reference to case law from the employment context is appropriate in this case because "the nature of [the] goods, services, facilities, privileges, advantages or accommodations" provided at Camp Chihowa necessitated that volunteers act in a capacity at least somewhat analogously to that of an employee. We have held that Title I of the ADA does not require an employer to create a new position or even modify an essential function of an existing position in order to accommodate a disabled worker. *See Smith v. Midland Brake, Inc*., 180 F.3d 1154, 1170 (10th Cir. 1999) (en banc). An employer is likewise not required to shift essential responsibilities to other employees that a disabled employee cannot perform. *See Martin v. Kansas*, 190 F.3d 1120, 1133 (10th Cir.1999) (even though the plaintiff could perform most of the duties of a corrections officer, he could not respond without hesitation or limitation in an emergency, which was an inherent requirement of the position), *overruled on other grounds by Bd. of Trustees of Univ. Ala. v. Garrett*, 531 U.S. 356 (2001); *see also Milton v. Scrivner, Inc.*, 53 F.3d 1118,

1124 (10th Cir. 1995) ("An employer is not required by the ADA to reallocate job duties in order to change the essential function of a job.").

The fact that MDA has previously allowed other volunteers to undertake lifting responsibilities that otherwise should have been performed by Plaintiffs does not necessarily mean that MDA incurs a continuing and indefinite obligation to do so in the future. In light of the district court's finding that lifting was an essential function for Plaintiffs, and Plaintiffs' previous inability to fulfill that function was diverting significant resources from the purpose for which the camp was intended, we cannot conclude that Title III requires the MDA to simply continue its past practice of allowing Ms. Bauer and Ms. Stolz to perform the duties they are capable of performing, with other essential responsibilities they cannot perform being assigned to other volunteers. For these reasons, we cannot hold that MDA violated Title III of the ADA when it began enforcing its "lift and care for a camper" rule, even though such enforcement denied Plaintiffs the opportunity to participate as volunteer counselors.

Accordingly, in light of our conclusion that MDA's eligibility criteria did not amount to unlawful discrimination under the ADA, the judgment of the district court is

**AFFIRMED**.